IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DENNIS L. CALLIHAN,                  }
                                     }
        Plaintiff,                   }
                                     }      CIVIL ACTION NO.
v.                                   }      03-AR-2420-S
                                     }
MCPHERSON OIL COMPANY, INC.,         }
                                     }
        Defendant.                   }

## MEMORANDUM OPINION

Before the court is the motion of defendant, McPherson Oil Company ("McPherson"), for summary judgment.[1] Plaintiff, Dennis Callihan ("Callihan"), sued his former employer, McPherson, alleging breach of contract, fraud, violation of an Alabama commissions statute, conversion and unjust enrichment. Jurisdiction is based on 28 U.S.C. § 1332.

### *Summary Judgment Facts*

The dispute centers on the termination of Callihan's employment in May 2002, and specifically on the existence and terms of an alleged agreement regarding the severance package Callihan would receive in the event of his termination. Callihan began his employment with McPherson, an Alabama based wholesale fuels

---

[1] Defendant also moved to strike certain statements (¶ 13-14, 16-17) in the affidavit of its former employee, Bryan Parker, as inadmissible hearsay. Defendant's argument misses the mark, because whether the statements are admissible as admissions of a party opponent or not, it is clear that the statements are relevant other than to "prove the truth of the matter asserted." F.R.E. 801(c). Thus, defendant's motion to strike is due to be denied as to those statements. Because the court does not rely on any of the other evidence objected to in defendant's motion, the motion to strike is due to be deemed moot in all other respects.

marketing company, in Atlanta, Georgia, in 1996.  Callihan's job responsibilities included tracking and analyzing fuel market data and soliciting fuel and fuel contract purchases for McPherson.

Callihan reported to several different executives during his employment with McPherson, including Tom Lewis ("Lewis") and Bryan Parker ("Parker").   In June 2001, McPherson's chief executive, Charles McPherson, held a meeting in Birmingham which was attended by Callihan, Lewis and Parker, among others.  During this meeting, Charles McPherson instructed Callihan to stop reporting to Lewis and start reporting to Parker.  He also informed Callihan that the company wanted him to transfer from Atlanta to Birmingham.

Callihan took a week vacation to consider whether to move to Birmingham and continue his employment with McPherson.  During his vacation, Callihan e-mailed a letter to Parker, McPherson's CFO, outlining the conditions upon which he would move to Birmingham. Those conditions, which the letter identified as the "details" of his "moving, compensation, and exit package," included the following items: (1) that McPherson keep him whole on the sale of his recently purchased Atlanta home, including "real estate fees and any potential loss;" (2) expenses for a one bedroom apartment in Birimingham; (3) temporary living expenses; (4) moving expenses; and (5) an "exit package" equal to the "prior 12 month compensation" and to "include all current bonuses."

In 2001, Callihan earned a base salary of $50,000, plus 3% of

2

net profit on fuel sales.  His pay included his base salary plus a draw against his share of profits, which resulted in an annual regular salary of around $80,000.

Parker and Callihan subsequently discussed these conditions over the telephone, and according to Callihan's deposition testimony, Parker objected to the approximately $80,000 exit package, at which point Callihan told Parker that the exit package was a deal breaker and Parker agreed to his terms by saying "all right."  Additionally, according to Callihan's testimony, Parker told him that he had the authority to do whatever it took to get Callihan to Birmingham.  The terms of this exit package were never placed in writing.

After several further discussions regarding the details of Callihan's relocation and continued employment with McPherson, on August 16, 2001, he met with Parker and Charles McPherson.  The parties disagree about the extent of agreement that was reached at this meeting, but Callihan's deposition testimony indicates that they agreed to all the items detailed in his e-mail letter, plus an additional two months living expenses.  On August 20, Parker sent Callihan a memo purporting to be "the formal documentation of McPherson Oil's agreement with you relating to your move to Birimingham as far as reimbursements for that move."  The memo stated that McPherson would cover personal moving expenses, three months temporary housing expenses in Birmingham, costs associated

3

with leasing Callihan's Atlanta home for 6 months, and the memo further stated that McPherson would make Callihan whole on his existing $20,000 equity in his Atlanta home.  The memo also purported to be the "inclusive list" of "move related items" that McPherson would cover for Callihan.

Callihan moved to Birmingham and continued his employment with McPherson, and he reported to Parker.  In May 2002, Parker resigned and Callihan was instructed to begin reporting to Lewis, which he refused to do.  On May 8, 2002, Callihan was terminated.  McPherson has in fact paid Callihan for several move-related items, but it has made no payment toward the "exit package" that is allegedly due Callihan.

On May 31, 2002, McPherson sent Callihan a letter and a statement calculating that the company owed him $8,635.92 in commissions.  The parties now agree that calculation was accurate as to the amount of bonus or commission owed Callihan.  Over a year later, on November 10, 2003, McPherson  sent a check to Callihan's counsel for that amount and a letter to Callihan stating that "[t]his check is payment in full for all monies currently owed to you by McPherson."  Callihan did not negotiate the check, and his counsel returned it to McPherson's counsel several months later.

### *Analysis*

*Breach of Contract*

First, McPherson argues that, even viewing the facts in the

light most favorable to Callihan, he cannot establish a *prima facie* breach of contract case.  Callihan provides evidence that he agreed to come to Birmingham and continue working for McPherson in exchange for certain return promises, among them a promise to provide him with an "exit package" in the event either party terminated the employment relationship for any reason. McPherson argues that it never agreed to any exit package. Whether the parties struck such an agreement is a material fact issue for jury resolution, and summary judgment is due to be denied as to Callihan's breach of contract claim.  *See Lawler Mobile Homes, Inc. v. Tarver*, 492 So.2d 297, 304 (Ala. 1986)("[w]hether the contract was accepted and acted upon was a question of fact for the jury to decide").

Despite this apparent fact issue, McPherson asserts that no valid employment contract existed.  To support its position, McPherson cites Alabama case law for the well established proposition that an employment contract without any specifics regarding term, length, or duration of employment is an employment at will contract, which is terminable by either party at any time, for any reason or no reason at all.  *Aldridge v. Daimler Chrysler Corp.*, 809 So.2d 785, 793 (Ala. 2001).  This rule does not mean that any terms agreed to are *per se* invalid or unenforceable; rather, the rule generally means that the employee has no contractual right to continued employment.  Callihan

5

argues just the opposite. Viewing the facts in the light most favorable to him, he was unwilling to move to Birmingham without receiving a severance package as part of his contract, for the very reason that his employment was terminable at any time.

McPherson next contends that, even if an enforceable agreement existed, Callihan cannot recover because he breached the implied covenant of good faith and fair dealing by refusing to report to Lewis and/or refusing to work with McPherson's management/leadership committee. According to Callihan, if he left or was fired for any reason, the exit package would become payable. Perhaps if Callihan had left in an obvious effort to trigger payment of this exit package, he would be guilty of bad faith, but the facts as they appear on summary judgment do not support such an inference.

Callihan also contends that McPherson is liable in contract for the expenses related to the leasing of his Atlanta home for June 2002. There is no dispute that the agreement between the parties did not contemplate these expenses. In fact, the deal memorialized in Parker's memo to Callihan covered lease expenses for the six month period ending March 2002. Apparently, Callihan's theory of recovery is that because McPherson continued to pay his lease related expenses for April and May 2002, it created an expectation that the June expenses would also be paid by McPherson. Callihan has failed to show any basis in law or

6

fact from which to infer the existence of an enforceable implied promise to pay the June lease expenses, and McPherson is entitled to judgment as a matter of law that such damages are not recoverable based on Callihan's breach of contract claim.

The same is true of Callihan's alleged breach of contract damages related to the purchase and renovation of his Birmingham home.  Breach of contract damages are limited to those flowing naturally and proximately from a breach and their purpose is to put the injured party in the position he would have been in but for the breach.  *Hobson v. Am. Cast Iron Pipe Co.*, 690 So.2d 341, 344 (Ala. 1997).  Simply put, Callihan has failed to make any showing that the alleged breach of contract – the refusal to pay him certain post-termination compensation and expenses – is causally related to his expenses in purchasing and/or renovating his Birmingham residence.  While it may be generally true that but for McPherson's promises to provide an exit package, Callihan would not have agreed to continue working and to move to Birmingham, McPherson is not obligated to place Callihan in a better position than he would be in had the breach of contract not occurred.  In other words, if Callihan was entitled to and does recover the exit package money he seeks, it would be a windfall beyond the scope of contract damages to allow him to recover for expenses and investments related to his Birmingham residence.  Accordingly, McPherson is entitled to judgment as a

7

matter of law that such damages are not recoverable based on the alleged breach of contract claim.

*Fraud*

McPherson asserts that Callihan cannot maintain an action for breach of contract and fraudulent misrepresentation based on the same transaction.  This argument misconstrues Alabama law.  *See Deupree v. Butner*, 522 So.2d 242, 244 (Ala. 1988)("[i]n Alabama, a single transaction can support an award of damages for both breach of contract and fraud").  *Deupree* does stand for the proposition that there may be only one recovery of <u>compensatory</u> damages where one transaction gives rise to both fraud and breach of contract claims.  *Id.* at 244-45.  That does not mean, however, that a plaintiff may not proceed under alternative theories.  Viewing the evidence in the light most favorable to Callihan, he has presented substantial evidence as to each of the elements of a *prima facie* case, making summary judgment inappropriate.

*Claims Related to Commissions Owed Callihan*

Callihan brings three claims related to the commissions that McPherson allegedly wrongfully withheld from him: (1) violation of § 8-24-3 of the Alabama Code; (2) unjust enrichment; and (3) conversion.  There is no dispute that the amount of commissions owed to plaintiff at the time of his termination was $8,635.92.  There are sharply contested issues of fact, however, surrounding the chronology of events between Callihan's May 2002 termination

and McPherson's November 2003 tender of these commissions to Callihan, through his counsel.  Accordingly, summary judgment is inappropriate on the above-mentioned three claims.

### *Conclusion*

For the foregoing reasons, defendant's motion for summary judgment will be granted in part and denied in part.  Defendant's motion to strike will be denied in part and deemed moot in part. A separate and appropriate order will be entered.

DONE this _____ day of November, 2004.


_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

9